UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
AMANDA COAXUM,

                                    Plaintiff**,**

                  -against-                                    **COMPLAINT**
                                                              **JURY TRIAL DEMANDED**
THE CHILDREN'S VILLAGE INSTITUTE, THE
CHILDREN'S VILLAGE and JEREMY CHRISTOPHER
KOHOMBAN,

                                    Defendants.
----------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.  This is a civil rights and employment discrimination action brought by Plaintiff Amanda Coaxum against her former employer, The Children's Village and its related entities, for violations of the Americans with Disabilities Act (ADA), and the New York State Human Rights Law (NYSHRL). Plaintiff, a dedicated Community Caseworker employed since 2019, was wrongfully terminated in March 2024 following months of unlawful treatment stemming from her well-documented mental health disability and her protected activity in seeking a reasonable accommodation.

2.  In 2021, Ms. Coaxum was involved in a traumatic car accident while nine months pregnant. Though she returned to work and performed her duties capably, she later developed serious mental health conditions—including PTSD, generalized anxiety, and depression—that significantly limited her ability to drive, especially long distances. Despite informing her supervisors and HR of her limitations and submitting formal medical documentation through the company's third-party administrator, Sedgwick, Defendants ignored or denied the existence of her request and failed to accommodate her.

3.  Instead of engaging in the interactive process required by law, Defendants increased pressure on Plaintiff to perform duties that directly conflicted with her medical restrictions. In a particularly egregious move, they unilaterally revised her job description to include mandatory driving—duties that were not essential in her original job—and used her refusal to sign this revised description as a pretext for immediate termination.

4.  Throughout her ordeal, Ms. Coaxum was subjected to repeated threats, disparaging remarks, administrative hurdles, and an escalating hostile work environment. Her requests for reasonable accommodations were met with silence, coercion, or retaliation. Management personnel and HR failed to investigate her concerns or intervene, despite

having full knowledge of her condition and her attempts to comply with internal procedures.

5.  Defendants' conduct reflects a systemic failure to protect the rights of an employee with a disability. Rather than provide support, they chose to isolate, scrutinize, and ultimately dismiss her under false pretenses. As a result, Plaintiff seeks redress for violations of her statutory rights under federal and state law, including claims for disability discrimination, failure to accommodate, retaliation, hostile work environment, and interference with protected leave.

6.  Further, this discriminatory and retaliatory treatment did not occur in a vacuum. Defendant Jeremy Christopher Kohomban, the President and Chief Executive Officer of both The Children's Village and The Children's Village Institute, held direct oversight responsibility over the senior leadership involved in these events. Among them was Meagan Stone, Director of Human Resources, who is prominently listed on The Children's Village website as a leadership figure.



Figure 1. Defendant Kohomban and Ms. Stone as listed in the senior staff section of the Children's Village website. Retrieved from https://childrensvillage.org/about-us/our-team/senior-staff/

7.  Given the seriousness and duration of Plaintiff's situation, one that involved medical documentation, HR meetings, leadership involvement, and ultimately a termination, it is implausible that such issues could have remained unknown to Mr. Kohomban. If Ms. Stone failed to escalate these issues to her superior, it reflects a systemic breakdown in leadership accountability; if she did escalate the matter, and Mr. Kohomban declined to act, then his inaction constitutes a knowing and willful failure to intervene in clear violations of Plaintiff's rights under federal and state law. In either scenario, Mr. Kohomban failed in his legal and ethical duty to prevent, stop, or remedy the discriminatory and retaliatory conduct that unfolded under his direct leadership.

## JURISDICTION AND VENUE

8. This is a civil action brought pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL").

9. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as they are so related to the federal claims that they form part of the same case or controversy.

10. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because the Defendants reside and/or conduct business in this district, including in Westchester County, New York.

11. Plaintiff has satisfied all administrative prerequisites to bringing this action under the ADA, including filing a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and receiving a Notice of Right to Sue.

## THE PARTIES

12. Plaintiff AMANDA COAXUM hereinafter ("Plaintiff") or ("Plaintiff Coaxum") or ("Ms. Coaxum") resides at 650 Stoneleigh Ave, Apt 514, Carmel, NY 10512.

13. Defendant THE CHILDREN'S VILLAGE INSTITUTE, is a Domestic Not-For-Profit Corporation located at 1 Echo Hills Rd, Dobbs Ferry, NY 10522.

14. During any period of time whatsoever during the six years immediately preceding the filing of this Complaint, Defendants TCV performed one or more of the following actions: (1) hired the Plaintiff, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

15. Defendant THE CHILDREN'S VILLAGE, hereinafter is a Domestic Not-For-Profit Corporation located at 1 Echo Hills Rd, Dobbs Ferry, NY 10522.

16. During any period of time whatsoever during the six years immediately preceding the filing of this Complaint, Defendants TCV performed one or more of the following actions: (1) hired the Plaintiff, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

17. Defendant JEREMY CHRISTOPHER KOHOMBAN, hereinafter ("Defendant Kohomban") or ("Mr. Kohomban"), is an individual who acts as the CEO the Childrens Village.

18. Defendant Kohomban performed one or more of the following actions while Plaintiff was working for the Defendants: (1) hired the Plaintiff, (2) terminated the employment of the Plaintiff, (3) set the wage rate of Plaintiff, (4) maintained payroll records concerning the Plaintiff, or (5) instituted work rules for the Plaintiff.

## SINGLE INTEGRATED ENTERPRISE

19. Upon information and belief, Defendants The Children's Village and The Children's Village Institute operate as a single integrated enterprise. Both entities are collectively referred to herein as ("Corporate Defendants") or ("Defendant TCV") or ("Defendant The Children's Village") or ("The Children's Village").

20. Corporate Defendants conduct business under the shared name and brand of "The Children's Village," and they present themselves to the public, employees, and partner organizations as a unified entity.

21. Plaintiff Amanda Coaxum performed her job duties without distinction between The Children's Village and The Children's Village Institute. Her responsibilities, including case management, family outreach, youth services, and documentation, were carried out under the operational structure and direction of both entities, without any material differentiation.

22. All tasks assigned to Plaintiff and her coworkers across the Corporate Defendants furthered the joint operations of the integrated enterprise. Plaintiff reported to supervisors and staff who acted on behalf of both entities, including but not limited to her direct supervisors and members of the Human Resources department.

23. Corporate Defendants jointly controlled Plaintiff's terms and conditions of employment, including work assignments, leave administration, and decisions related to accommodations and termination. For example, Plaintiff's medical leave and return-to-work process were managed through Sedgwick, but communication and decision-making involved representatives from both entities, without clear delineation.

24. Upon information and belief, employees—including Plaintiff—were regularly assigned to programs, locations, or duties affiliated with either entity, with no distinction in pay, titles, job descriptions, or oversight. Plaintiff's job functions extended across initiatives associated with both The Children's Village and The Children's Village Institute.

25. Corporate Defendants share centralized human resources, payroll, and supervisory structures. Employees receive directives from the same senior leadership and are subject

to uniform workplace policies, including leave, performance evaluation, and disciplinary procedures.

26. Upon information and belief, Defendant Kohomban, who is named as an individual Defendant in this action, serves concurrently as President and Chief Executive Officer of both The Children's Village and The Children's Village Institute. Mr. Kohomban exercises significant operational and strategic control over both entities and was, at all relevant times, responsible for the implementation and oversight of employment policies impacting Plaintiff.

27. As such, Corporate Defendants function as a single integrated enterprise under common ownership, management, and control, and are jointly and severally liable for the unlawful conduct alleged in this Complaint.

28. Defendant The Children's Village, Defendant The Children's Village Institute and Defendant Kohomban will jointly be referred to herein as ("Defendants").

## FAILURE TO UPHOLD STATED POLICIES ON DIVERSITY, INCLUSION, AND MENTAL HEALTH SUPPORT

29. The Children's Village publicly claims that it is "more than a place to work," describing itself as a mission-driven organization that values growth, contribution, and meaningful impact. It emphasizes that employees will "influence children, youth, and families not only for today but also well into their futures."



Figure 2. Promotional image and description from the "Careers" section of The Children's Village website, portraying an idealized and supportive work environment. Retrieved from https://childrensvillage.org/employment/

30. The organization also highlights its commitment to workplace "Culture," promoting core values of Diversity, Lifelong Learning, and Commitment to Excellence. These principles are visually and textually emphasized on its public-facing materials, where The Children's Village states: "We value diversity and celebrate its power to enrich us all," and that it does not discriminate based on "physical or mental disability," among other protected categories.

31. However, the actions of The Children's Village in the case of Plaintiff Amanda Coaxum stand in stark contrast to these stated commitments. Despite suffering from medically documented mental health conditions—including anxiety, depression, and PTSD—and despite making multiple good-faith efforts to seek accommodation, Plaintiff was met with bureaucratic stonewalling, apathy, and retaliation from leadership and Human Resources.

32. Rather than honoring its values of inclusivity, mental health support, and organizational excellence, The Children's Village created and tolerated a workplace where Plaintiff's disability was treated as an inconvenience and a liability. Her driving restriction—fully supported by her physician and Sedgwick's communications—was ignored, dismissed, and ultimately used against her to justify her termination.



Figure 3. Screenshot from the "Culture" section of The Children's Village website, where the organization publicly asserts its commitment to diversity, lifelong learning, and excellence, and expressly states that it does not discriminate on the basis of "mental disability." The red box highlighting "mental disability" was added for emphasis and is not part of the original webpage. Retrieved from https://childrensvillage.org/employment/

33. While The Children's Village claims to be an "Equal Opportunity Employer," its treatment of Ms. Coaxum reveals a systemic failure to uphold the very principles it promotes publicly. Multiple supervisors and HR officials, all of whom were aware of Plaintiff's condition and medical documentation, refused to engage in the legally required interactive process or offer even minor accommodations—accommodations routinely extended to other staff.

34. This gap between stated policy and actual practice not only undermines The Children's Village's credibility, but also raises serious concerns about the organization's treatment of employees with disabilities. The institution's public image of inclusiveness and empathy is starkly contradicted by its internal conduct in this case.

## BACKGROUND FACTS

35. The Children's Village is an organization established in 1851, dedicated to serving society's most vulnerable children and families with a primary focus on child safety and family unity. It offers a range of programs, such as short-term residential care for youth in foster care, the juvenile justice system, and homeless teens. Additionally, The Children's Village provides affordable housing solutions for individuals aging out of foster care or facing economic disadvantages.[1]

36. Defendant TCV employed Plaintiff Coaxum as a W2 non-exempt wage earner.

37. The Children's Village hired Plaintiff Coaxum on or around March 19, 2019.

38. Plaintiff Coaxum stopped working for the Defendants on or around March 15, 2024.

39. Defendants employed Plaintiff Coaxum as a Community Caseworker[2].

40. Ms. Coaxum's role as a Community Caseworker (CCW) required her to develop and maintain relationships with the families of client youth, including those not physically in care, to ensure that these families received comprehensive services throughout their participation in the program. The position required a commitment to the Integrated

---

[1] The Children's Village. (n.d.). About Us. https://childrensvillage.org/about-us/

[2] The Community Caseworker (CCW) develops and maintains relationships with families of client youth who may not be physically in care and ensures that they receive comprehensive services throughout their participation in the program. The CCW shows dedication and willingness to work within the Integrated Treatment Model (ITM), supporting and carrying out the functions of the model to best serve the population. The CCW is expected to have a nonjudgmental approach that focuses on skill building and basic principles of behavior (reinforcement, extinction, blocking and shaping). The CCW is required to function as part of a team, committing to modeling pro social behavior and building positive relationships with all residents. The Community Caseworker provides case planning services and case planning support within their assigned residential division. The CCW caseload includes youth who have returned home, as well as youth in alternate settings or who are missing from care. Additionally, the CCW supports other case planning responsibilities throughout their assigned residential division. **Ex. 1_Complainant's Original Job Description (2022)**

Treatment Model (ITM), which focuses on skill building and behavioral principles such as reinforcement, extinction, blocking, and shaping.

41. Ms. Coaxm's position as a Community Caseworker required her to engage in various responsibilities focused on supporting children and families within the community. Her job description emphasized relationship building, communication, and case management. Key duties included ensuring compliance with agency and departmental safety procedures, reporting unsafe practices or environments, and actively participating in corrective measures. Plaintiff was tasked with supporting the reunification of children with their families or other caregivers, fostering stability and trust within those relationships. Her role involved initiating and maintaining regular contact with families, primarily in their homes, to assess and provide necessary support. Collaboration with other service providers and facilities was a critical aspect of her job, as she coordinated care with mental health providers, correctional institutions, and educational programs. **Ex. 1_Plaintiff's Job Description (2022).**

42. At all relevant times Ms. Coaxum could perform the essential functions of her job.

43. Plaintiff Coaxum was rarely, if ever, disciplined during her employment with Defendant TCV.

44. On February 14, 2025, Plaintiff Amanda Coaxum received a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission (EEOC), formally authorizing her to pursue her claims in federal court. **Ex. 2_EEOC Right to Sue Letter dated February 14, 2025.**

## MOTOR VEHICLE ACCIDENT LEADING SEVERE CAR ACCIDENT, CHRONIC INJURIES, AND MENTAL HEALTH STRUGGLES.

45. On June 19, 2021, Ms. Coaxum, a 31-year-old woman who was nine months pregnant, was involved in a motor vehicle collision. She was the restrained driver of her vehicle when another car failed to stop at a stop sign, causing a T-bone collision. At the time of the accident, Ms. Coaxum's three-year-old daughter was also in the car.

31-year-old female who is 9 months pregnant involved in a motor vehicle collision at home and T-boned another car, patient was restrained driver, no airbags, patient ambulate on scene to the back seat with her 3-year-old daughter was sitting, patient had complaint of left lateral neck pain, and lower back pain, patient has no paresthesias, no numbness or weakness, no LOC, no headache, no abdominal pain

Figure 4. Excerpt from Emergency Department Provider Notes Documenting Motor Vehicle Accident and Resulting Pain Complaints (June 19, 2021)

46.  In the weeks that followed, Plaintiff experienced some lingering pain and discomfort, which she managed through physical therapy and home care. Over time, her condition improved, and she was able to resume her normal activities.

47.  In July 2023, Defendants hired Maribel Rivera (hereinafter "Ms. Rivera") and informed Plaintiff Coaxum that she would be her new supervisor.

48.  On or around September 2023, Plaintiff Coaxum's supervisor, Ms. Rivera, instructed her to drive alone to a work-related meeting in Boston, a journey requiring approximately four hours of travel.

49.  The assignment to Boston would have required Plaintiff to undertake the longest drive she had attempted since her 2021 motor vehicle collision.

50.  Upon receiving the directive, Ms. Coaxum immediately experienced acute psychological distress, including anxiety and panic attacks. The assignment triggered vivid recollections of her traumatic accident, rendering her unable to safely operate a vehicle—even for short, routine trips—let alone an extended interstate drive.

51.  In or around September 2023, Plaintiff was instructed by her supervisor, Ms. Maribel Rivera, to complete a long-distance trip to Boston alone in order to retrieve a minor. During this exchange, which occurred in person in Ms. Rivera's office, Plaintiff expressed that she did not feel comfortable making the trip by herself due to the distance and the stress it caused her. At that time, Plaintiff did not explicitly reference a medical condition or provide documentation, as she herself was not yet fully aware of the scope or nature of her medical issue. Nevertheless, Plaintiff verbally communicated her discomfort and concern regarding the assignment.

52.  In an effort to reach a workable solution, Plaintiff requested to be accompanied by another caseworker to assist with the drive—an accommodation that had been extended to other employees in similar circumstances, both for temporary and permanent medical or logistical needs. Despite this reasonable and previously accepted practice, her request was summarily denied by Ms. Rivera, who insisted that Plaintiff complete the trip alone, without further discussion or offer of alternatives.

53.  For instance, a coworker named Amber, a social worker, was previously unable to drive due to a sprained ankle and was accommodated by coworkers who shared driving duties during her recovery.

54.  Similarly, another employee, Courtney Glover, who suffers from epilepsy and experiences unpredictable seizures, was granted a complete exemption from driving duties as a reasonable accommodation.

55.  Despite these precedents, Ms. Coaxum's request for support was denied, even though she was experiencing significant medical impairments that made it functionally unsafe for her to operate a vehicle for an extended period. Although she had not yet been formally

diagnosed with a medical condition, and was herself unaware of the underlying clinical cause, she clearly communicated her difficulty with completing the trip alone.

56. Plaintiff request was consistent with accommodations previously granted to other employees facing temporary or permanent limitations, yet no flexibility or alternative arrangement was offered in her case.

57. After Ms. Rivera refused Ms. Coaxum's request to be accompanied by a colleague for the drive, without offering any valid justification, Plaintiff proposed alternative accommodation and refused to engage in any meaningful dialogue about other options.

58. At that time, Plaintiff felt dismissed and increasingly distressed, as the denial of her request failed to consider the extent of the mental impairments she was already experiencing. These impairments significantly limited her ability to perform major life activities, including driving and concentrating at work, particularly in the face of escalating pressure, stress, and anxiety. The employer's lack of responsiveness compounded the emotional toll on Plaintiff, leaving her without support as her condition continued to deteriorate.

59. On September 18, 2023, Ms. Rivera sent Plaintiff an email reiterating the expectation that she complete the Boston assignment alone. In the message, Ms. Rivera wrote: "There is a standing expectation that you complete diligence by the end of the month, completing the trip to Boston as discussed," and instructed Plaintiff to "please reach out to me and Mark for any support needed." Mr. Mark Treimel (hereinafter "Mr. Treimel"), Ms. Rivera's direct supervisor, was copied on this email, thereby placing him on notice of both the directive and Plaintiff's potential need for assistance or accommodation. **Ex. 3_Email from Ms. Rivera to Plaintiff and Mr. Treimel (Sept. 18, 2023).**

60. Although the email superficially suggested that support was available, in practice, Plaintiff had already attempted to raise her concerns with Ms. Rivera verbally and was met with no flexibility or meaningful engagement. On multiple occasions, Plaintiff expressed that she was not well and felt emotionally unfit to complete the trip alone, but Ms. Rivera failed to acknowledge those concerns or explore any accommodations. **Ex. 3_Email from Ms. Rivera to Plaintiff and Mr. Treimel (Sept. 18, 2023).**

61. Neither Ms. Rivera nor Mr. Treimel responded with any alternative plan or assistance. Instead, the directive was restated without modification, and Plaintiff was effectively pressured to proceed with the assignment despite her clearly expressed distress.

62. Plaintiff could have completed the required diligence duties, including the Boston assignment, had a simple and reasonable accommodation been provided, such as assigning a second caseworker to accompany her, which had been routinely done for other employees.

63. Upon information and belief, this form of support had previously been extended to coworkers with temporary logistical needs as well as to employees with known disabilities.

Nevertheless, Defendants failed to offer this option to Plaintiff, despite her expressed discomfort and the feasibility of the accommodation.

64. On the days she was scheduled to travel to Boston, Ms. Coaxum suffered acute anxiety attacks that substantially interfered with her ability to perform her job duties. Her symptoms included overwhelming nervousness, profuse sweating, sensations of overheating, intense itchiness, and persistent nausea, all of which left her physically and mentally incapacitated.

65. During this period, no one from management, Human Resources, or Ms. Rivera, as Ms. Coaxum's direct supervisor, made any effort to contact Plaintiff to inquire about her health status or determine whether she required any accommodations to perform her duties safely. This complete lack of follow-up reflected not only indifference to her well-being but also a failure to comply with Defendants' legal obligation to engage in a timely, good-faith interactive process under the ADA.

66. These episodes of anxiety were closely tied to the trauma Plaintiff had previously experienced in a motor vehicle accident and significantly impaired her ability to drive safely. Although Plaintiff had not yet received a formal medical diagnosis at the time, the symptoms she experienced—including emotional distress, difficulty concentrating, and physical manifestations of anxiety—made it unsafe for her to operate a vehicle, particularly for extended trips.

67. These impairments not only endangered her own health, but also posed a substantial risk to the safety of the vulnerable children she was expected to transport. Driving, while part of her duties, required mental clarity and emotional regulation that Plaintiff was unable to sustain during these periods of heightened anxiety.

68. Although Plaintiff did not specify that she was suffering from a diagnosed medical condition—because, at the time, no such diagnosis had yet been made—she made several good-faith efforts to express to her supervisor, Ms. Rivera, that she was not well. Plaintiff communicated that the situation was emotionally overwhelming, that she did not feel capable of completing the Boston trip alone, and that it was taking a significant toll on her well-being.

69. At all relevant times, Plaintiff exhibited clear and observable signs of emotional and psychological strain, particularly in connection with the directive to drive alone over a long distance to Boston. These signs were both objectively visible and subjectively communicated. Plaintiff expressly told Ms. Rivera that she did not feel well, that the assignment was overwhelming, and that she could not complete the trip alone.

70. Despite these repeated expressions of distress, Ms. Rivera dismissed Plaintiff's concerns, took no steps to inquire further into her condition, and failed to provide any support or engage in an interactive process to consider alternatives, such as assigning a second staff member to accompany her, as had been done in the past for similarly situated employees.

Instead, Ms. Rivera treated the situation as routine, disregarding the clear impact that the directive was having on Plaintiff's mental and emotional health.

71. Unable to complete the assignment due to the severity of her symptoms, Ms. Coaxum was forced to call out of work for two consecutive days. On the third day, as her condition deteriorated, she sought emergency medical care. At the emergency room, medical professionals confirmed her diagnosis of anxiety and referred her for intensive treatment. Ms. Coaxum was subsequently admitted to a partial inpatient program at St. Vincent's Hospital, where she received structured mental health treatment from September 2023 through late October 2023.

72. Plaintiff Coaxum was on leave from September 19, 2023, to December 22, 2023.

73. During this period she submitted a formal request for Personal Time Off ("PTO") for December 26, 2023, in accordance with company policy.

74. During this program, Ms. Coaxum participated in therapy sessions daily to address her anxiety and related symptoms.

75. Following her discharge, Ms. Coaxum continued weekly therapy sessions with a community therapist and remained on medical leave until her return to work on December 22, 2023.

## MENTAL HEALTH-RELATED MEDICAL CONDITIONS AND SUBSTANTIAL IMPAIRMENTS

76. Ms. Coaxum suffers from significant mental health conditions, including Major Depressive Disorder, Recurrent, Moderate (ICD-10: F33.1), Generalized Anxiety Disorder (ICD-10: F41.1), and Post-Traumatic Stress Disorder (ICD-10: F43.10). These conditions constitute a physical or mental impairment that substantially limits one or more major life activities, including her ability to drive, concentrate on a single task, affects her sleep by preventing her from maintaining a consistent sleep schedule, sometimes resulting in complete sleeplessness, and perform daily activities essential to her role and personal life. **Ex. 4_Plaintiff Medical Records_**

77. Ms. Coaxum's mental health conditions stem from PTSD (Post-Traumatic Stress Disorder), a psychiatric condition triggered by traumatic events that cause severe emotional and psychological distress. In Ms. Coaxum's case, her PTSD is directly tied to the severe car accident in 2021, which occurred during the final stages of her pregnancy.

78. The limitations caused by Ms. Coaxum's conditions are well-documented. Medical evaluations confirm that her PTSD, anxiety, and depression manifest in symptoms such as persistent nervousness, an inability to control worrying, difficulty concentrating, insomnia, fatigue, and avoidance behaviors. These symptoms interfere with her ability to drive safely and perform other major life activities, such as interacting socially, parenting, and fulfilling professional obligations.

79. Additionally, Ms. Coaxum's Major Depressive Disorder contributes to symptoms such as persistent feelings of hopelessness, low energy, lack of motivation, difficulty concentrating, and trouble sleeping. The combination of her depression and anxiety further impairs her ability to operate a vehicle over long distances safely.

80. Plaintiff's generalized Anxiety Disorder has been assessed using the GAD-7 questionnaire[3], which consistently shows a high level of impairment, including episodes of becoming easily annoyed, irritable, and hyper-focused on catastrophic outcomes. Her PHQ-9 assessments also confirm moderate to severe depression, with reported difficulty maintaining focus, a lack of pleasure in daily activities, and persistent fatigue.

81. Her medical records document a well-established history of significant impairments. Diagnoses from qualified professionals, including licensed therapists and board-certified psychiatrists, consistently confirm her need for accommodations to address substantial limitations caused by her conditions.

82. Ms. Coaxum's treatment regimen includes weekly therapy sessions and the prescription medication Lexapro, a selective serotonin reuptake inhibitor (SSRI). Lexapro is widely prescribed for the treatment of mental health conditions such as Major Depressive Disorder (MDD) and Generalized Anxiety Disorder (GAD), targeting symptoms like persistent sadness, fatigue, and excessive worrying.

**IMPROPER HANDLING OF MEDICAL DOCUMENTATION LEADING TO RETALIATION AND WRONGFUL TERMINATION BASED ON DISABILITY AND PROTECTED ACTIVITY**

83. On December 14, 2023, Plaintiff emailed the lead coordinator, Ms. Chara Henry (hereinafter "Ms. Henry") from Sedgwick[4], her Return-to-Work Form signed by her primary care physician, Dr. Agastin Michael ("Dr. Michael"). Attached to this email was medical documentation supporting Ms. Coaxum's need for reasonable accommodations due to her disability.

84. The physician's recommendation outlined a restriction on driving, noting that driving exacerbated Ms. Coaxum's anxiety symptoms and posed significant risks to her health and safety. The form indicated that the duration of this restriction was "TBD" (to be

---

3 The Generalized Anxiety Disorder 7-item (GAD-7) questionnaire is a validated, self-administered screening tool used by clinicians to assess the severity of generalized anxiety disorder symptoms. Scores range from 0 to 21, with higher scores indicating more severe anxiety. It is widely used in both clinical and occupational health settings to support diagnosis and treatment planning. Anxiety and Depression Association of America. (n.d.). Generalized anxiety disorder (GAD) retrieve on May 6, 2025 from https://adaa.org/understanding-anxiety/generalized-anxiety-disorder-gad

4 Sedgwick is a global company offering technology-driven solutions for risk, benefits, and business operations across various industries. The company specializes in claims management, loss adjustment, and related services, helping organizations handle insurance claims, workers' compensation, and other risk-related issues. Sedgwick also manages return-to-work forms and accommodation requests, providing programs designed to support the safe and efficient reintegration of injured or ill employees into the workforce. Their accommodation assessment services guide employers and employees through the interactive process required by the Americans with Disabilities Act (ADA). By overseeing these procedures, Sedgwick helps ensure legal compliance and promotes employee well-being.. Sedgwick. (n.d.). Solutions: Return-to-work programs. Retrieved November 18, 2024, from https://www.sedgwick.com/solutions/casualty/workers-compensation/managed-care/return-to-work. Sedgwick. (n.d.). ADA accommodation services. Retrieved November 18, 2024, from https://marketing.sedgwick.com/acton/attachment/4952/f-bbe77cd1-6f1b-46c8-a5fb-74db5a73cf65/1/-/-/-/-/ADA%20accommodation%20services_flyer_02.02.21.pdf

determined), as Ms. Coaxum was required to undergo further consultations with a therapist to evaluate her ongoing treatment plan. **Ex. 5_2023.12.14_Request for Accommodation and Supporting Medical Documentation_**

85. In the email, Ms. Coaxum formally requested accommodation to address these limitations in her ability to perform certain job-related tasks. **Ex. 5_2023.12.14_Request for Accommodation and Supporting Medical Documentation_**



Figure 1. Excerpt from page 2 of Plaintiff's Return-to-Work Form detailing her need for accommodations. (The green box was added and is not part of the original document)

86. On December 19, 2023, Ms. Henry emailed Plaintiff informing her about the end of her leave of absence. Ms. Henry wrote "Your leave of absence is scheduled to end on 12/21/2023 If you need additional time away from work, please respond to this email or call me at (888) 436-9530. Remember, if your employer requires a release to work notice prior to returning to work, please have the release notice returned via fax (888) 436-9535 as soon as possible." **Ex. 6_Email Correspondence Regarding Return-to-Work Form and Accommodation Request_**

87. Ms. Henry did not provide any response regarding the status of Plaintiff Coaxum's accommodation request made by her physician, Dr. Michael.

88. On December 22, 2023, Ms. Coaxum emailed Ms. Henry to inquire whether she had received her Return-to-Work Form, which included her accommodation request. Later that same day, approximately six minutes after the inquiry, Ms. Henry confirmed via email, the receipt of the form, writing, "Hello, I received your return-to-work form." Ex. 6_Email Correspondence Regarding Return-to-Work Form and Accommodation Request_

89. Despite successfully submitting her Return-to-Work Form to Ms. Henry on December 14, 2023, in accordance with the procedures established by The Children's Village, and receiving confirmation of receipt on December 22, 2023.

90. Upon returning from medical leave, Plaintiff was instructed to report directly to Mr. Treimel. In accordance with that instruction, Plaintiff met with Mr. Treimel in his office,

where she was informed that the employer had not received any request for accommodation related to her return to work.

91. Plaintiff Coaxum immediately explained that she had submitted the necessary documentation through Sedgwick, the third-party administrator managing her medical leave, and that she had been granted a reasonable accommodation by her physician, Dr. Michael, specifically related to her driving restrictions. In response, Mr. Treimel directed her to resolve the matter with Human Resources.

92. Accordingly, Plaintiff went to the HR offices and approached HR representative Amy Herdog (hereinafter "Ms. Herdog") to seek clarification and assistance.

93. Ms. Herdog informed Plaintiff that no documentation had been received and instructed her to follow up with Sedgwick. In response, Ms. Coaxum explained, just as she had previously informed her superior, Mr. Treimel, that she had been granted an accommodation by her physician, Dr. Michael, specifically regarding her driving restrictions. She further stated that both her doctor and the Sedgwick platform had confirmed submission of the relevant documentation. Despite this, rather than investigating or attempting to resolve the issue internally, Ms. Herdog placed the full burden on Plaintiff to rectify the situation.

94. On December 27, 2023, seeking clarification, Ms. Coaxum once again contacted Ms. Henry from Sedgwick regarding the status of her accommodation request. In her email, Plaintiff stated, "Good morning, I had a restriction [referring to her no-driving accommodation] on my return-to-work form, but my job has not been notified yet. Is there anything else needed for this so they can be notified?" **Ex. 6_Email Correspondence Regarding Return-to-Work Form and Accommodation Request_**

95. On December 27, 2023, Ms. Thawama Thomas (hereinafter "Ms. Thomas"), another employee from Sedgwick assumed Plaintiff Coaxum's case. In an email on that date, Ms. Thomas confirmed that the Return-to-Work Form, which included Ms. Coaxum's accommodation request, had been sent to Defendants on December 22, 2023, stating, "Chara sent over your return to work form with your restrictions to your employer as of 12/22/23. Please follow up with your employer." **Ex. 6 _Email Correspondence Regarding Return-to-Work Form and Accommodation Request_**

96. The following day, on December 28, 2023, Ms. Thomas sent another email to Ms. Coaxum, forwarding the same Return-to-Work Form initially sent by Ms. Chara Henry to Defendants. This document clearly outlined Ms. Coaxum's accommodation request.

97. Despite this confirmation, Plaintiff was effectively placed in the middle of a bureaucratic loop, forced to act as a go-between among Sedgwick, Human Resources, and her direct supervisors. Even though she had timely submitted her documentation, received confirmation from Sedgwick, and personally informed both Mr. Treimel and Ms. Herdog of her medical restrictions, Plaintiff was nonetheless required to continue chasing acknowledgments and clarifications from each party.

98. Rather than coordinating internally to verify what had already been submitted and confirmed, Defendants placed the ongoing burden entirely on Plaintiff to reconcile communication failures between their internal departments and Sedgwick. This cycle of passing responsibility back and forth caused unnecessary delay, confusion, and emotional strain, exacerbating the already challenging circumstances of her return to work following medical leave.

99. This exchange of emails with Sedgwick representatives not only confirmed that Ms. Coaxum had effectively notified her employers of her need for accommodations but also highlighted Defendants' failure to engage in an interactive process. For over ten days, Ms. Coaxum was forced to repeatedly follow up and attempt to corroborate the status of her accommodation request, instead of receiving the legally required efforts from Defendants to address her needs and provide reasonable accommodations.

100. On December 26, 2023, Plaintiff Coaxum did not report to work, as she had previously requested and been approved for paid time off (PTO) for that date as early as October. Plaintiff had requested the day off in anticipation of the challenges she would face securing childcare for her daughters the day following the Christmas holiday.

101. On December 27, 2023, Ms. Rivera summoned Plaintiff Coaxum to her office to address her absence on December 26, despite the fact that it had been approved as paid time off (PTO) months in advance. When Plaintiff clarified that she had followed all required procedures for requesting and securing leave through Defendants' designated platform, Ms. Rivera disregarded the explanation. Instead, Ms. Rivera claimed the absence was not valid because Plaintiff was still technically on medical leave and, therefore, should have requested the day off as sick leave rather than PTO. She proceeded to characterize the absence as a "no call, no show," and escalated the matter by threatening disciplinary action, stating, "I'll have to give you a write-up for this."

102. During the discussion, Ms. Rivera made inappropriate and disparaging remarks about Plaintiff Coaxum's disability, further compounding the discriminatory treatment she had already endured. Referring to Plaintiff's driving restriction and the recent PTO issue, Ms. Rivera stated, "First the driving, and now this, Amanda. You're not making things easy for me."

103. This comment conveyed that Plaintiff's medical condition and her reasonable accommodation requests were perceived as an inconvenience or burden—both to Ms. Rivera personally and to Defendant The Children's Village—rather than as protected rights under applicable disability laws.

104. Ms. Rivera further expressed dissatisfaction with the medical leave previously taken by Plaintiff Coaxum and insinuated that she was unfit to perform her duties due to her inability to drive. This assertion directly targeted Plaintiff's disability and the resulting medical restriction, despite the fact that driving was not listed as an essential function in her official

16

job description. See Ex. 1, Plaintiff's Original Job Description (2022). Ms. Rivera's remarks reflected a discriminatory attitude toward Plaintiff's protected medical condition and disregarded the employer's obligation to provide reasonable accommodations. **Ex. 1_Plaintiff's Job Description (2022)**

105. On December 28, 2023, Ms. Rivera summoned Ms. Coaxum to her office once again for a follow-up meeting regarding her December 26 absence. During this meeting, Ms. Rivera instructed Ms. Coaxum to count the day as part of her vacation time instead of PTO.

106. Ms. Coaxum agreed to count the day as vacation time, largely out of fear that refusing could lead to retaliation or negative consequences for her job. Even so, Ms. Rivera's tone made it clear she was still dissatisfied, and she once again brought up the possibility of issuing a write-up. Confused by the mixed messages, Ms. Coaxum asked, "If this is a call no show, why are you saying that I have to take it from my vacation time?" Ms. Rivera did not provide a clear answer, leaving Ms. Coaxum uncertain and increasingly concerned about the fairness and consistency of how she was being treated.

107. During the conversation, Ms. Rivera once again expressed dissatisfaction with Ms. Coaxum's performance, this time focusing specifically on her inability to drive due to her medical condition. In response, Ms. Coaxum reminded Ms. Rivera that she had already disclosed her driving restrictions and submitted medical documentation from her treating physician in support of her accommodation request.

108. Although no formal disciplinary action was taken following this exchange, the conversation was marked by repeated threats from Ms. Rivera and left Plaintiff feeling targeted and undermined. Rather than addressing the matter constructively, Ms. Rivera used the opportunity to highlight what she perceived as deficiencies in Ms. Coaxum's performance, deficiencies directly tied to her disability, contributing to a hostile and retaliatory work environment.

109. On December 29, 2023, Ms. Amanda Coaxum emailed her supervisors, Mr. Treimel and Schmika Risher (hereinafter "Ms. Risher"), requesting that a neutral third party be present in all future meetings with Ms. Rivera due to the ongoing harassment she had experienced. In her message, Ms. Coaxum expressed concern for her well-being and the need for oversight, stating: "Good morning, moving forward I will not be meeting with Ms. Rivera alone anymore. Can leadership please assist with ongoing supervision and other meetings." See **Ex. 7_2023.12.29_Email Correspondence Regarding Meetings with Ms. Rivera.**

110. On January 2, 2024, Ms. Risher responded to Plaintiff Coaxum's concerns by scheduling a meeting for that same day at 1:00 PM. However, rather than using the meeting as an opportunity to address Plaintiff's medical accommodation needs or investigate her complaints about Ms. Rivera's discriminatory conduct, the discussion took an inappropriate turn.

111. The meeting was attended by Ms. Risher, Mr. Treimel, and Ms. Rivera—an unexpected and confrontational setting for which Plaintiff had received no prior notice or opportunity to prepare. During the meeting, Plaintiff reiterated that she was under medical restrictions preventing her from driving long distances and once again raised the discriminatory and disparaging remarks made by Ms. Rivera following her return from medical leave. Despite the seriousness of these concerns, neither Ms. Risher nor Mr. Treimel took any immediate or meaningful steps to investigate Plaintiff's complaints or to address the hostile environment she was experiencing.

112. Although Mr. Treimel and Ms. Risher verbally assured Plaintiff that her concerns would be reviewed, no concrete measures were taken to accommodate her disability or address the ongoing harassment. This response—or lack thereof—contributed to the ongoing hostile work environment.

113. During the meeting, Ms. Rivera categorically denied all allegations concerning her conduct and reiterated her position that Plaintiff Coaxum must be able to drive in order to effectively perform her job duties. Plaintiff, in turn, once again explained her medical limitations, emphasizing that driving posed a risk not only to her own health but also to the safety of the children she would be required to transport. She proposed reasonable alternatives, including the possibility of coordinating with colleagues for transportation or using public transit such as the train.

114. Despite having submitted a formal request for accommodation nearly three weeks earlier—supported by medical documentation—Defendants failed to provide any resolution or engage in a good-faith interactive process to explore feasible options. As of that meeting, Plaintiff had not received any response, explanation, or acknowledgment indicating that her request was being seriously considered.

115. On January 11, 2024, Ms. Rivera summoned Plaintiff to a meeting in her office, during which she presented a revised version of Plaintiff's job description. Ms. Rivera stated that the changes were necessary "to update certain roles within the company."

116. However, the only substantive modification to the original 2022 job description was the addition of a new clause explicitly requiring Plaintiff to possess the ability to drive for purposes such as transporting youths, conducting home assessments, and performing other case-related duties, requirements that directly conflicted with Plaintiff's known medical limitations and her pending request for accommodation.

117. At the time of this meeting, Ms. Rivera was fully aware of Plaintiff's driving restriction and the supporting medical documentation submitted weeks earlier, making the proposed change particularly coercive and retaliatory in nature.

118. What Ms. Rivera failed to disclose to Plaintiff was that the revised job description she presented was, in all material respects, identical to the version Plaintiff had received and accepted in 2022, except for one significant and targeted alteration. The only substantive

change was the insertion of a new "Duties/Responsibilities" clause explicitly requiring the "ability to drive as requested for the purpose of transporting youths, completing community diligence, home assessments, face-to-face contacts with family members, and for all other relevant case planning reasons; distance and duration of drives will vary, and trips may include overnight stays due to distance."

119. This was not a routine update or operational adjustment. Rather, the newly inserted driving requirement functioned as a retroactive justification, crafted to create a pretext for adverse action against Plaintiff based on a known disability-related limitation, despite the employer's prior acceptance of her restrictions and the absence of any such requirement in her original job description. **Ex. 8_Proposed Revised Job Description for Plaintiff (2024)**

120. Ms. Rivera proceeded to pressure Plaintiff to sign the revised job description, despite full knowledge of its direct conflict with Plaintiff's documented medical restrictions—submitted nearly a month earlier on December 14.

121. Plaintiff refused, clearly stating, "Don't ask me to do this; I can't drive right now—I'm not capable. It was clearly stated in the doctor's note." She further explained the gravity of the request, emphasizing that compelling her to drive under her current condition not only endangered her own health, but also posed a serious safety risk to the vulnerable youth she would be required to transport. Plaintiff's refusal was grounded in both her medical condition and a legitimate concern for the welfare of the individuals in her care. **Ex. 8_Proposed Revised Job Description for Plaintiff (2024)**

Figure 5. Comparison of Plaintiff's Original Job Description (2022) and Proposed Revised Job Description (2024)

122. For Ms. Rivera, these valid concerns appeared to hold no relevance. Her insistence on compelling an employee with a documented disability to take on tasks that not only endangered Ms. Coaxum's life but also placed the lives of her young passengers at risk seemed driven solely by a desire to assert authority, rather than accommodating the legitimate needs of a disabled employee.

123. Upon information and belief, despite her role as a Community Caseworker being identical to that of another employee, Sabrina Lang ("Ms. Lang"), the updated driving requirement was imposed exclusively on Plaintiff Coaxum. Ms. Lang, who held the same position, did not receive a similar job description update, raising serious concerns about unequal treatment and discrimination.

124. Ms. Coaxum became aware of this disparity after speaking directly with Ms. Lang, asking on January 11, 2024, the same day Ms. Rivera send the papers if she had any knowledge of changes to her job duties or if she had been asked to sign a revised job description. Ms. Lang confirmed that she had not been informed of any such changes or required to sign any updated documentation.

125. On or around March 13, 2024, Plaintiff attended a meeting in the Human Resources department, held in the office of Ms. Meagan Stone (hereinafter "Ms. Stone"), the Human Resources Director. Plaintiff had previously received a calendar invitation via Outlook from one of Ms. Stone's assistants.

126. Upon arriving at the Human Resources offices on or around March 13, 2024, Plaintiff found herself joined by Ms. Rivera and Mr. Treimel. The purpose of the meeting, contrary to any collaborative intent, was to pressure Plaintiff to sign the revised job description, which now included a mandatory driving requirement, despite her previously submitted medical documentation expressly restricting her from driving.

127. Plaintiff clearly reiterated her physical inability to comply with those duties and reminded Ms. Stone that she had submitted a formal accommodation request on December 14, 2023, supported by her physician and processed through Sedgwick, the third-party administrator. That request had been acknowledged by multiple Sedgwick representatives and had already been discussed with both her superiors Ms. Rivera, Mr. Treimel, Ms. Risher and HR representative Ms. Herdog.

128. Incredibly, Ms. Stone responded by claiming that Human Resources had no record of any such accommodation request, despite Plaintiff's repeated submissions and prior confirmations from Sedgwick. Ms. Stone provided no assistance, documentation, or explanation to support this assertion. Instead, she simply warned Plaintiff that failure to comply with the revised job description—including the newly added requirement to drive alone for work assignments—could result in her termination.

129. During the meeting, Plaintiff expressed the extreme stress she was experiencing due to the contradictory information and lack of support she had received: "This is really stressful. I'm going back and forth with you, I'm going back and forth with Sedgwick." She explained that Sedgwick had confirmed that her documentation had been submitted and forwarded to the employer, yet she was being told otherwise.

130. Ms. Stone merely stated that she would "look into it" and provide Plaintiff with a definitive answer by the end of the day. No meaningful explanation or resolution was offered at that time.

131. This meeting laid bare Defendants' ongoing failure to engage in the interactive process. Despite months of repeated submissions, confirmations, and communications from Plaintiff to various levels of management, including her supervisors and HR staff, Defendants failed to take coordinated or good-faith steps to resolve the matter. The response from Ms. Stone—offering no resolution, denying the existence of documentation, and threatening termination—only compounded the discriminatory and retaliatory treatment Plaintiff had already endured.

132. Ms. Stone's position further compounded the discriminatory and retaliatory treatment Plaintiff had already endured, effectively penalizing her for a condition she had properly disclosed and for which she had lawfully sought protection.

133. Later that same day, on or around March 13, 2024, following Plaintiff's meeting with Ms. Stone in Human Resources, Plaintiff was summoned to a second meeting, this time in the office of Mr. Mark Treimel. Upon her arrival, Ms. Rivera was also present. During the

meeting, Mr. Treimel received a phone call from Ms. Stone, which was placed on speakerphone in the presence of all attendees. Ms. Stone informed Plaintiff that she had contacted Sedgwick once again and that, according to their records, no accommodation request had been received. Based on that representation, and citing Plaintiff's refusal to sign the revised job description with the added driving requirement, Ms. Stone announced, on the call and in front of Mr. Treimel and Ms. Rivera, that Plaintiff's employment with The Children's Village was terminated effective immediately.

134. During this meeting, Ms. Stone failed to provide any documentation or written confirmation from Sedgwick supporting her claim that no accommodation request had been received. She did not request to see any of the email communications, confirmations, or supporting evidence that Plaintiff had in her possession—despite Plaintiff's repeated statements that she had submitted the required documentation and received confirmation of its transmission.

135. Throughout the conversation, both Ms. Rivera and Mr. Treimel remained silent. Neither intervened, clarified, nor acknowledged the fact that they had first-hand knowledge of Plaintiff's medical impairments, her driving restrictions, and her ongoing efforts to obtain a reasonable accommodation. Their silence, in the face of a clearly unsupported justification for termination, underscored Defendants' collective disregard for Plaintiff's rights under federal and state disability laws.

136. As of that date, on information and belief, all relevant personnel involved in Plaintiff's employment, supervision, and accommodation process were fully aware of her request for reasonable accommodation. These individuals included: Ms. Maribel Rivera, Social Work Supervisor at The Children's Village; Mr. Mark Treimel, Ms. Rivera's direct supervisor; Ms. Schmika Risher, Division Director; Ms. Amy Herdog, Human Resources representative; Ms. Meagan Stone, Director of Human Resources; Ms. Chara Henry, Lead Coordinator at Sedgwick; and Ms. Thawama Thomas, a Sedgwick employee. Plaintiff's request—submitted on December 14, 2023—had been acknowledged by both Ms. Henry and Ms. Thomas, who confirmed its receipt and transmission to Defendants. Despite this shared knowledge, no effective action was taken to implement the requested accommodation or engage in the required interactive process under applicable law.

137. Although Plaintiff was verbally terminated during the meeting held on March 13, 2024, she did not receive written confirmation of her dismissal until Friday, March 15, 2024, when she was contacted via email by Ms. Britaney Prince, Employee Relations Coordinator. The attached termination letter was brief and direct, stating only that Plaintiff was "terminated effective immediately for refusing to perform the required functions of [her] job." **Ex. 9_2024.3.15_Plaintiff's Termination Letter_**

138. The letter failed to acknowledge Plaintiff's documented medical condition, her pending request for reasonable accommodation, or any of the efforts she had made to comply with internal processes. No explanation was provided regarding the interactive process, and no

consideration was given to alternative measures that could have allowed Plaintiff to remain employed. The communication reflected a complete lack of procedural fairness and demonstrated Defendants' continued disregard for their legal obligations and for Ms. Coaxum's rights as an employee with a disability.

139. Despite having full knowledge of Plaintiff's request for accommodation and the supporting documentation, Defendants collectively placed the entire burden of navigating the process on Ms. Coaxum. In the midst of a disorganized and bureaucratic response, not a single individual in a position of authority paused to consider Plaintiff's condition, her well-being, or the potential consequences of forcing her into a situation that could endanger both herself and others. Defendants prioritized procedural compliance and internal checkboxes over the legal and ethical obligation to protect the health and safety of their employee.

140. At no point did Defendants attempt to engage in a meaningful dialogue to identify alternative solutions or accommodations that would have allowed Ms. Coaxum to continue working safely while receiving therapeutic support. Their refusal to consider any reasonable alternatives demonstrated a complete disregard for her dignity, her mental health, and their obligations under the law.

141. Ms. Coaxum was fully capable of performing the essential functions of her position with reasonable accommodations. The adjustments required were minor and well within the scope of feasible workplace modifications. Had Defendants engaged in a good faith interactive process, these accommodations would have allowed her to continue working productively.

142. The termination of Ms. Coaxum's employment was not only unwarranted but also rooted in discriminatory and retaliatory intent. Defendants' actions—including assigning tasks that contradicted her known medical restrictions, attempting to unilaterally alter her job duties, and ultimately terminating her employment—were directly connected to her disability and her protected activity in requesting accommodations. These adverse actions reflect a clear pattern of hostility toward her disability status and her efforts to assert her rights under the law.

143. Taken together, the facts demonstrate that Defendants failed to engage in the required interactive process, disregarded Ms. Coaxum's legitimate medical documentation, and instead chose to retaliate against her for seeking reasonable accommodations. Their conduct constitutes a violation of her rights under the Americans with Disabilities Act and other applicable laws.

## PATTERN OF COERCIVE USE OF JOB DESCRIPTIONS TO JUSTIFY TERMINATION

144. Plaintiff alleges, upon information and belief, that Defendant has engaged in a pattern or practice of coercing employees into signing revised job descriptions that are inconsistent

with their existing duties and incompatible with their known medical limitations, in order to force compliance with its "Covid-19 Policy" and retaliate against employees who object.

145. In a similar case Josefina Tavares[5] a long-term employee, objected to the defendant's Covid-19 vaccination and testing mandates and sought clarity regarding her rights under the ADA. Rather than engage in an individualized assessment, Defendant altered Ms. Tavares's job description mid-employment to include unrelated or newly added duties.

146. Ms. Tavares was told that unless she signed the new job description, which incorporated the responsibilities of multiple positions without added compensation, she would be terminated. When she refused to sign under protest, citing lack of consent and ongoing retaliation, Defendant The Children's Village informed her that her employment would be immediately terminated.

147. This is materially identical to the experience of Plaintiff Coaxum in the present case, who was similarly pressured to sign a modified job description that conflicted with her medical restrictions and reasonable accommodation request. When she refused to sign due to the imposed duties that violated her restrictions, Defendant The Children's Village used her refusal as grounds for termination.

148. These facts reflect a broader pattern of coercive employment practices by Defendant The Children's Village, in which the modification of job descriptions serves as a tool to eliminate employees who assert legal rights, rather than a legitimate business necessity. Defendant The Children's Village conduct illustrates willful disregard for its obligations under the ADA and supports an inference of discriminatory and retaliatory motive in Plaintiff's termination.

## **FIRST CAUSE OF ACTION**
(Disability Discrimination)
(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.)
*Asserted by Plaintiff against all the Defendants*

149. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

150. The provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

151. The ADA prohibits an employer like the Defendants from discriminating against employees like Plaintiff because of a disability, a record of such an impairment, or being regarded as having such an impairment.

---

[5] Tavares v. The Children's Village, No. 7:22-cv-09806, Complaint, ECF No. 2 (S.D.N.Y. Nov. 16, 2022).

152. The Defendants discriminated against Plaintiff by modifying her job description to include duties inconsistent with her documented medical restrictions, disregarding her accommodation requests, and ultimately terminating her employment because of her disability.

153. By the Defendants' unlawful discriminatory conduct, they violated the ADA.

154. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## SECOND CAUSE OF ACTION
### (Failure to Accommodate- Disability)
(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.)
*Asserted by Plaintiff against all the Defendants*

155. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

156. The provisions of the ADA applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

157. The ADA requires employers like the Defendants to provide reasonable accommodations to qualified individuals with disabilities so they can perform the essential functions of their position.

158. The Defendants failed to accommodate Plaintiff's disability by rejecting her driving-related medical restrictions, refusing to engage in an interactive process, and altering her job duties to include driving without justification.

159. By the Defendants' unlawful failure to accommodate, they violated the ADA.

160. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## THIRD CAUSE OF ACTION
### (Retaliation - Disability)
(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.)
*Asserted by Plaintiff against all the Defendants*

161. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

162. The provisions of the ADA applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

163. The ADA prohibits an employer like the Defendants from retaliating against an employee for requesting a reasonable accommodation or otherwise exercising rights under the statute.

164. The Defendants retaliated against Plaintiff by targeting her for disciplinary threats, modifying her job duties in a way that conflicted with her known disability, and terminating her employment shortly after she asserted her right to accommodation.

165. By the Defendants' unlawful retaliatory conduct, they violated the ADA.

166. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## FOURTH CAUSE OF ACTION
(Hostile Work Environment - Disability)
(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.)
*Asserted by Plaintiff against all the Defendants*

167. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

168. The provisions of the ADA applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

169. The ADA prohibits employers like the Defendants from subjecting employees to a hostile work environment based on disability.

170. The Defendants subjected Plaintiff to repeated disparaging comments, threats of discipline, differential treatment, and undue pressure related to her medical condition, all of which created an objectively and subjectively hostile work environment.

171. By the Defendants' unlawful creation and maintenance of a hostile work environment, they violated the ADA.

172. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## FIFTH CAUSE OF ACTION
(Discrimination - Disability)
(NYSHRL, N.Y. Exec. Law § 290 et seq.)
*Asserted by Plaintiff against all the Defendants*

173. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

174. The provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

175. The NYSHRL prohibits an employer like the Defendants from discriminating against an employee on the basis of an actual or perceived disability.

176. The Defendants discriminated against Plaintiff by denying her accommodations, revising her job description to include incompatible duties, and terminating her employment due to her disability.

177. By the Defendants' unlawful discriminatory conduct, they violated the NYSHRL.

178. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## SIXTH CAUSE OF ACTION
(Failure to Accommodate – Disabilty)
(NYSHRL, N.Y. Exec. Law § 290 et seq.)
*Asserted by Plaintiff against all the Defendants*

179. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

180. The provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

181. The NYSHRL requires employers like the Defendants to provide reasonable accommodations to employees with known disabilities, unless doing so would impose an undue hardship.

182. The Defendants failed to accommodate Plaintiff's disability by rejecting her physician-documented driving restrictions, refusing to engage in a timely interactive process, and attempting to restructure her position in a way that conflicted with her disability-related limitations.

183. By the Defendants' unlawful failure to accommodate, they violated the NYSHRL.

184. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## SEVENTH CAUSE OF ACTION
(Retaliation- Disability)
(NYSHRL, N.Y. Exec. Law § 290 et seq.)
*Asserted by Plaintiff against all the Defendants*

185. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

186. The provisions of the NYSHRL applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

187. The NYSHRL prohibits an employer like the Defendants from retaliating against an employee for requesting a reasonable accommodation or opposing practices forbidden under the statute.

188. The Defendants retaliated against Plaintiff for asserting her right to accommodations and for reporting discriminatory conduct by targeting her for discipline, revising her job duties in a way that contradicted her medical restrictions, and terminating her employment.

189. By the Defendants' unlawful retaliatory conduct, they violated the NYSHRL.

190. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## EIGHTH CAUSE OF ACTION
(Hostile Work Environment - Disability)
(NYSHRL, N.Y. Exec. Law § 290 et seq.)
*Asserted by Plaintiff against all the Defendants*

191. Every fact alleged herein is repeated, re-alleged, and incorporated as though set forth herein.

192. The provisions of the NYSHRL applied to the Defendants and protected the Plaintiff while Plaintiff worked for the Defendants.

193. The NYSHRL prohibits employers from creating or tolerating a hostile work environment based on disability.

194. The Defendants subjected Plaintiff to discriminatory remarks, targeted scrutiny, inconsistent treatment, and persistent pressure related to her disability and accommodation request, thereby fostering a hostile and offensive work environment.

195. By the Defendants' unlawful conduct in maintaining a hostile work environment, they violated the NYSHRL.

196. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## NINTH CAUSE OF ACTION
(Aider & Abbettor Discrimination)
(New York State Human Rights Law)
*Asserted by Plaintiff against Defendant Kohomban*

197. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

198. At all relevant times, Defendant Kohomban served as President and Chief Executive Officer of both The Children's Village and The Children's Village Institute. In that capacity, he exercised operational and executive oversight over all departments, including Human Resources and supervisory personnel responsible for enforcing compliance with the New York State Human Rights Law ("NYSHRL").

199. The NYSHRL makes it unlawful for any person to aid, abet, incite, compel, or coerce the doing of any act forbidden under the statute, including acts of disability discrimination,

failure to accommodate, retaliation, and the creation of a hostile work environment. N.Y. Exec. Law § 296(6).

200. The New York State Human Rights Law (NYSHRL), specifically § 296(6), makes it unlawful for any person to aid, abet, incite, compel, or coerce the commission of any act prohibited under the statute, including—but not limited to—acts of disability discrimination, failure to accommodate, retaliation, and the maintenance of a hostile work environment; accordingly, any individual who knowingly allows or enables such conduct, including through deliberate inaction despite a duty to act, may be held liable for aiding and abetting unlawful employment practices.

201. Despite his executive position and authority to take corrective action, Defendant Kohomban failed to intervene, failed to investigate the discriminatory conduct, and failed to ensure that appropriate steps were taken to comply with the NYSHRL. His inaction contributed to and perpetuated the unlawful conduct committed by supervisors and HR personnel under his direction and control.

202. By permitting the continued mistreatment of Plaintiff despite being in a position to prevent or stop it, Defendant Kohomban aided and abetted the discriminatory acts and retaliatory decisions made by other agents and employees of the Corporate Defendants.

203. As a direct and proximate result of Defendant Kohomban's actions and omissions, Plaintiff suffered emotional distress, reputational harm, economic loss, and the termination of her employment in violation of her rights under the NYSHRL.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff seeks all available remedies available under all causes of action listed herein in this Complaint and any and all remedies that the Court deems just and proper. Including but not limited to All lost wages and benefits, front pay, prejudgment and post judgment interest, liquidated damages, punitive damages, statutory penalties, emotional distress damages; recovery of reasonable costs, attorney fees, and expenses; equitable relief, and any other relief considered just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Fed. R. Civ. P., Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated:   White Plains, New York
        May 9, 2025

                                                EL-HAG & ASSOCIATES, P.C

By: _____

Jordan El-Hag, Esq.
El-Hag & Associates, PC
777 Westchester Ave., Ste. 101
White Plains, NY 10604
jordan@elhaglaw.com
courtnotices@elhaglaw.com